UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>    v.<br><br>JOEY CARDIEL,<br><br>        Defendant. | No. 1:22-cr-00041 NODJ BAM<br><br>ORDER DENYING DEFENDANT'S MOTIONS TO SUPPRESS AND MOTION TO DISMISS<br><br>(Docs. 28, 29, 31) |

Joey Cardiel was stopped one night, while driving car belonging to someone else, because the car had expired registration. The deputy making the stop searched the vehicle and discovered he possessed and rifle and a bindle of methamphetamine. During this process, the deputy learned that Mr. Cardiel was a felon and was, therefore, prohibited from having a firearm. Cardiel was charged with a violation of 18 U.S.C. § 922(g)(1). (Doc. 1)

The deputy filed a police report in which he attributed statements to Mr. Cardiel admitting he had methamphetamine in the car and on his person and that he possessed the rifle. Cardiel now moves the Court to suppress all evidence stemming from the car search and all statements attributed to him. Mr. Cardiel asserts that he did not make the statements, that he did not consent to the search and that he was not advised of his Miranda rights. Mr. Cardiel contends also that the action should be dismissed because 18 USC § 922(g)(1) is unconstitutional.

Because the Court determines the officers had probable cause to search the cabin of the

car and the trunk, because Mr. Cardiel consented to the search of the vehicle and because the Court finds that the deputy's testimony about Mr. Cardiel's statements is credible, the motions to suppress are **DENIED**. Also, because the Court § 922(g)(1) is constitutional, the motion to dismiss is **DENIED without prejudice**.

## I.  Factual Background

According to his testimony, Deputy Jacob Woesner stopped the Chevy Cobalt just before midnight on January 16, 2022, for having expired registration and approached the car. Deputy Woesner asked for the driver for his license and registration, who provided them. Mr. Cardiel also told the officer his name. Deputy Woesner then asked if there was anything illegal inside the car. The deputy asked this question based upon his training and for officer safety purposes. Deputy Woesner, like all officers from the Fresno County Sheriff's Office, worked solo. The agency was "short staffed," and once field training was completed, deputies became "solo beat officers." Back up could be 10 to 30 minutes away, depending upon the deputy's particular beat.

Mr. Cardiel replied that there might be a little "dope" in the car. After the deputy asked him to clarify what that meant, Cardiel "explained there may some crystal methamphetamine" but did not specify where in the car the narcotics could be found. Deputy Woesner then asked whether there was anything else illegal inside the car, and Mr. Cardiel "stared at the steering wheel for a few moments before stating, 'No, there shouldn't be.'"

By this time, Deputy Woesner he had been a Deputy for about three years. He had conducted about 1,000 traffic stops and had read the Miranda rights to suspects upwards of 200 times. Deputy Woesner had been assigned to the area where the stop occurred for about a year and was aware that it contained a "narcotics corridor" through which offenders would move drugs.

Deputy Woesner then asked Mr. Cardiel if he could search the car, and Mr. Cardiel agreed. By this time, only two or three minutes had passed since Deputy Woesner stopped the car. Deputy Woesner searched the cabin of the car but found no drugs. Because he did not find the drugs Mr. Cardiel said were in the car, he moved to the trunk to search there. Upon opening it, Deputy Woesner found a .22 caliber semi-automatic rifle. Spontaneously, Mr. Cardiel said, "Oh

shit, I forgot that was in there." At this point, only about five minutes had passed since the deputy stopped the car.

Deputy Woesner then arrested Mr. Cardiel, placed him in handcuffs, placed him in the back of the patrol car, and read him his Miranda rights from the Miranda card (Ex. 1), which he carried with him. Mr. Cardiel acknowledged understanding the rights and agreed to waive him. Mr. Cardiel then said that he wanted to be honest and that he had hid methamphetamine behind his belt. The deputy had Mr. Cardiel step out of the car, and the deputy retrieved the drugs under the belt where Mr. Cardiel indicated. Mr. Cardiel told he officer that he had about $100 worth of methamphetamine.

The deputy asked about the gun. Mr. Cardiel explained that the gun was given to him by a friend. He said he traded methamphetamine to a fellow Bulldog gang member for the rifle, but he refused to provide the person's name. The deputy ran Mr. Cardiel's name through the Omnixx Force database and discovered that Mr. Cardiel was a convicted felon.

Mr. Cardiel testified that he was driving the Chevy Cobalt, which was not his car, but which he had permission to drive. The patrol car activated its lights to pull him over, and he complied. The deputy asked for his driver's license and registration, and after Mr. Cardiel provided them, the officer returned to his patrol car. Next, the deputy returned to the Chevy and ordered Mr. Cardiel out of the car, saying he as going to search the car. Mr. Cardiel told the deputy that he was not on probation or parole and that "it's an illegal search." Mr. Cardiel never gave consent for the deputy to search the car. Even still, the deputy searched the cabin of the car and then the trunk. He never told the officer he had drugs in the car. Once the officer searched the trunk, he discovered the rifle. The deputy did not say anything about the weapon, but then he placed Mr. Cardiel under arrest and put him in the back of the patrol car. By this time another deputy arrived and, before the incident finished, four more officers arrived.

Once he was in handcuffs, Deputy Woesner placed him in the back of the patrol car but did not at that time or at any time read him his Miranda rights. The deputy told Mr. Cardiel that he was going to jail and if he had "anything else on [him], to produce it right now so [he] won't be charged when [he gets] to the jail." The deputy said he was "squash" it and not include

3

1 whatever evidence produced in the police report. In response, Mr. Cardiel removed meth from

2 behind his belt and gave it to the deputy. The deputy then had Mr. Cardiel step back out of the

3 patrol car to take photos of his tattoos and asked him if he was an active gang member.

4       Mr. Cardiel admitted that his declaration filed with his motions, did not mention the other

5 officers being present, did not mention that the deputy would "squash" any evidence of other

6 crimes if Mr. Cardiel produced it, and it indicated that he "told" the deputy he had meth behind

7 his belt, rather than that Mr. Cardiel pulling the drugs out from behind his belt.

8 **II.**    **MOTION TO SUPPRESS**

9       **A.  The traffic stop was lawful.**

10       The Fourth Amendment states, "(t)he right of the people to be secure in their persons,

11 houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."

12 U.S. Const. amend. IV. "[T]he 'seizure' of a 'person,' which can take the form of 'physical force'

13 or a 'show of authority' that 'in some way restrain(s) the liberty' of the person." *Torres v.*

14 *Madrid*, 141 S.Ct. 989, 995 (2021) (citing *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)).  Traffic

15 stops, "even if only for a brief period and for a limited purpose," are "seizures" within the

16 meaning of the Fourth Amendment, and therefore are "subject to the constitutional imperative

17 that (they) not be 'unreasonable' under the circumstances." *Whren v. United States*, 517 U.S.

18 806, 810 (1996); *see also United States v. Arvizu*, 534 U.S. 266, 273 (2002); *United States v.*

19 *Colin*, 314 F.3d 439, 442 (9th Cir. 2002) ("The Fourth Amendment's prohibition against

20 unreasonable searches and seizures applies to investigatory traffic stops.").

21       "A police-initiated traffic stop is reasonable under the Fourth Amendment if the police

22 stop the vehicle because of a 'reasonable suspicion' that the vehicle's occupants have broken a

23 law." *United States v. Hartz*, 458 F.3d 1011, 1017 (9th Cir. 2006); *United States v. Lopez-Soto*,

24 543 F.3d 1080, 1087-1088 (9th Cir. 2008).  An officer making a traffic stop "must have a

25 particularized and objective basis for suspecting the particular person stopped of criminal

26 activity." *United States v. Cortez*, 449 U.S. 411, 417-18 (1981); *see also United States v. Valdes-*

27 *Vega*, 738 F.3d 1074, 1078 (9th Cir. 2013) (en banc).  "Subjective intentions play no role in

28 ordinary, probable-cause Fourth Amendment analysis." *Whren* at 810. Officers must have only

1  reasonable suspicion that a traffic infraction has occurred to make a traffic stop and the fact that
2  the officer does not, ultimately issue a citation or even mention the traffic infraction, does not
3  translate the stop into an unconstitutional seizure. *United States v. Willis*, 431 F.3d 709, 717 (9th
4  Cir. 2005).

5  To be lawful, a traffic stop must be limited in its scope: an officer may "address the traffic
6  violation that warranted the stop," make "ordinary inquiries incident to the traffic stop," and
7  "attend to related safety concerns." *Rodriguez v. United States*, 575 U.S. 348, 354-355 (2015).
8  The stop may last "no longer than is necessary to effectuate" these purposes and complete the
9  traffic "mission" safely. *Id*. A stop "may be extended to conduct an investigation into matters
10 other than the original traffic violation" so long as "the officers have reasonable suspicion of an
11 independent offense." *United States v. Landeros*, 913 F.3d 862, 867 (9th Cir. 2019).

12 There is little dispute that Deputy Woesner properly made the traffic stop. The evidence
13 demonstrates that the vehicle Mr. Cardiel was driving had an expired registration, and Mr. Cardiel
14 does not claim otherwise. The determination of Mr. Cardiel's motions to suppress boils down to
15 credibility. As to this dispute, the Court finds the deputy to be more credible. The deputy's
16 testimony was measured and offered the Court no reason to doubt his account of the events. Mr.
17 Cardiel's testimony, however, caused the Court concern.

18 First, and most obviously, Mr. Cardiel has reason to be dishonest. His demeanor while
19 testifying convinced the Court that he was not being truthful. Second, Mr. Cardiel's claim that
20 there were as many as five other deputies at the scene is unbelievable. For this to be true, Deputy
21 Woesner would have had to purposely omit this information from his law enforcement report
22 despite that having other deputies on scene to corroborate the details of Deputy Woesner's
23 account of the events would have been helpful to the Deputy. Moreover, if there were other
24 officers present, apparently none were willing to interfere with the illegal search or with Deputy
25 Woesner's failure to give the Miranda warnings and none, apparently, prepared a written report.
26 Likewise, the dispatcher's call log shows no indication that any other deputy appeared at the stop
27 or, even, were dispatched to the scene. Thus, to believe Mr. Cardiel, the Court would also have to
28 find that the dispatcher withheld this information from the call log, without having been given

any reason why the dispatcher would do this.[1]

Perhaps most telling is Mr. Cardiel's claim that Deputy Woesner told him that if he produced evidence of other crimes, the deputy would "squash" the evidence and Mr. Cardiel would not be charged. First, of course, the word "quash" is a bit of legalese that is frequently confused with the word "squash" by laypeople. Law enforcement officers are not laypeople, and, as Deputy Woesner testified, they have significant and frequent training in the law. The Court finds it exquisitely hard to believe that Deputy Woesner would say, "squash," when he meant "quash."

Second, Mr Cardiel offers no explanation why a deputy would promise to ignore evidence of methamphetamine possession or why a man with Mr. Cardiel's experience with the legal system, would believe such a promise. The explanation that Deputy Woesner gave, that Mr. Cardiel volunteered that he had drugs behind his belt, is credible. Knowing that he was going into custody and knowing bringing drugs into the jail setting was likely to bring a more serious charge than simple possession, a rationale person would ensure that the drugs, which would have been found inevitably, would be discovered before reaching the jail.[2] For these reasons, the Court concludes that Mr. Cardiel made the statements attributed to him by the deputy and Deputy Woesner advised Mr. Cardiel of his Miranda warnings. The Court rejects Mr. Cardiel's testimony to the contrary.

The Court finds that Deputy Woesner pursued the investigation of the traffic stop efficiently and diligently. He asked reasonable, limited questions to ensure his own safety, and this questioning did not prolong the stop. Once he learned there were narcotics in the car, the deputy still did not prolong the stop. By the time the deputy began searching the car only about two or three minutes had passed since he stopped the car, and the deputy found the rifle only about one or two minutes later. Thus, the Court **DENIES** the motions to suppress the Mr

---

[1] Moreover, though the Court has no information about how many deputies patrol metropolitan Fresno around the midnight hour, the evidence shows that only Deputy Woesner patrolled the area at issue. For four or five more officers to leave their own beats—leaving them unpatrolled—to travel to this traffic stop and then fail to prepare law enforcement reports, defies logic.

[2] *Nix v. Williams*, 467 U.S. 431, 443 (1984).

6

Cardiel's statements and suppression of the seized methamphetamine is **DENIED**.

### B. Mr. Cardiel's statements will not be suppressed.

The Fifth Amendment protects a person from being compelled to be a witness against oneself. At the time Deputy Woesner asked whether there was anything illegal in the car, as noted above, the purpose of asking the questions was for officer safety. Mr. Cardiel was not in custody at the time. Thus, the Fifth Amendment was not violated.

"Custodial interrogations, by their very nature, generate 'compelling pressures which work to undermine the individuals will to resist and to compel him to speak where he would not otherwise do so freely.'" *Moran v. Burbine*, 475 U.S. 412, 420 (1986) (quoting *Miranda*, 384 U.S. 436, 467 (1966)). "To combat this inherent compulsion, and thereby protect the Fifth Amendment privilege against self-incrimination, *Miranda* imposed on the police an obligation to follow certain procedures in their dealings with the accused." *Moran*, 475 U.S. at 420; see also *Dickerson v. United States*, 530 U.S. 428, 435 (2000); *United States v. IMM*, 747 F.3d 754, 764 (9th Cir. 2014). Miranda warnings are not rights but are "measures to insure that the right against compulsory self-incrimination [is] protected. Reviewing courts therefore need not examine Miranda warnings as if construing a will or defining the terms of an easement. The inquiry is simply whether the warnings reasonably conve[y] to [a suspect] his rights as required by Miranda. *Duckworth v. Eagan*, 492 U.S. 195, 203 (1989) (internal citation omitted). Thus, the Constitution requires only:

> that a person questioned by law enforcement officers after being "taken into custody or otherwise deprived of his freedom of action in any significant way" must first "be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed."

*Stansbury v. California*, 511 U.S. 318, 322 (1994) (quoting *Miranda*, 384 U.S. at 444). "For inculpatory statements made by a defendant during custodial interrogation to be admissible in evidence, the defendant's 'waiver of Miranda rights must be voluntary, knowing, and intelligent.'" *United States v. Garibay*, 143 F.3d 534, 536 (9th Cir. 1998). "A valid waiver of Miranda rights depends upon the 'totality of the circumstances including the background, experience, and conduct of defendant.'" *United States v. Shi*, 525 F.3d 709, 727 (9th Cir. 2008);

quoting *Garibay* at 536. The Court should consider many factors to determine whether the waiver was voluntary and knowing such as whether the defendant signed a written waiver, whether he received the warnings in his "native tongue," whether he appeared to understand his rights and whether he had prior experience in the criminal justice system, among other factors.

The evidence shows that at no time did Deputy Woesner draw his weapon during his encounter with Mr. Cardiel. Until the deputy found the rifle, he did not handcuff Mr. Cardiel, and he read Mr. Cardiel the Miranda warnings verbatim from his department-issued card (Ex 1.) Mr. Cardiel testified in English, while demonstrating his command of the language. Mr. Cardiel testified that he had been arrested before and knew his Miranda rights. Based upon this evidence, the Court finds that Mr. Cardiel's waiver of his Miranda rights was knowing and voluntary. Consequently, the motion to suppress on this basis is **DENIED**.

### C. Deputy Woesner was entitled to search the car.

"The Fourth Amendment generally requires police to secure a warrant before conducting a search." *California v. Carney*, 471 U.S. 386, 390-391 (1985). It is the government's burden of establishing the admissibility of evidence obtained without a warrant. *See United States v. Shetler*, 665 F.3d 1150, 1157 (9th Cir. 2011) (noting that in determining whether statements were the product of an illegal search, "[i]t is the government's burden to show that evidence is not 'fruit of the poisonous tree'"); *United States v. Chamberlin*, 644 F.2d 1262, 1269 (9th Cir. 1980) (noting that determination of whether evidence was obtained by exploitation of an illegal act focuses on "the causal connection between the illegality and the evidence; and, the burden of showing admissibility rests on the prosecution").

#### i. Deputy Woesner acted with consent to search the car.

The Court concludes that Mr. Cardiel voluntarily gave permission to search the vehicle. Deputy Woesner did not draw his weapon at any point during his encounter with Mr. Cardiel and there is no evidence that he used any other manner of intimidation. The deputy had not detained Mr. Cardiel by the time Mr. Cardiel gave permission. He had not placed Mr. Cardiel in handcuffs or placed him in the patrol car before the consent was given nor did he do so during the search, and he did not threaten Mr. Cardiel with a search warrant or other negative consequence for

failing to consent. Deputy Woesner testified that Mr. Cardiel was cordial and cooperative throughout. During the search, Mr. Cardiel did not object, but Deputy Woesner positioned him nearby to allow him to do so if he chose. Because the consent was voluntary, Deputy Woesner was entitled to search the car. *United States v. Jones*, 286 F.3d 1146, 1152 (9th Cir. 2002). Consequently, the evidence found in the car will not be suppressed.

### ii. Deputy Woesner had probable cause to search the car.

The "automobile exception" allows an officer to search a vehicle without a warrant. *Maryland v. Dyson*, 527 U.S. 465, 467 (1999) ("A search is not unreasonable if based on probable cause or facts that would justify the issuance of a warrant, even though a warrant has not been actually obtained."). "If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment . . . permits police to search the vehicle without more." *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996). "Probable cause to search exists when the known facts and circumstances are sufficient to warrant a reasonable person to conclude that contraband or evidence of a crime will be found." *United States v. Ibarra*, 345 F.3d 711, 716 (9th Cir. 2003) Probable cause justifies the search of every part of a lawfully stopped vehicle and its contents that may conceal the object of the search. *Wyoming v. Houghton*, 526 U.S. 295, 301 (1999). There is probable cause if there is "'a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Underwood*, 725 F.3d 1076, 1081 (9th Cir. 2013) (quoting *Illinois v. Gates*, 462 U.S. 213, 231, 240 (1983), 462 U.S. at 238); *Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294, 307 (1967).

Mr. Cardiel initially stated that there may be meth in the car. Then, when the deputy asked him whether there was anything else illegal in the car, Mr. Cardiel acted guiltily when he hesitated in responding, stared at the steering wheel, and then said, "There shouldn't be." This conduct and his statements were sufficient to support probable cause for the officer to search the car.

An accused person may move to suppress evidence obtained in violation of the Fourth Amendment's prohibition against unreasonable searches and seizures. *See, e.g., United States v. Calandra*, 414 U.S. 338, 341 (1974); Fed. R. Crim. P. 41(h). When deciding a motion to

1  suppress, courts first determine whether a Fourth Amendment violation occurred, and then
2  whether suppression is appropriate. *See Davis v. United States*, 564 U.S. 229, 236–39 (2011). The
3  burden is on the accused to show that their Fourth Amendment rights were violated by the
4  challenged search or seizure to have standing to challenge the admission of evidence. *Simmons v.*
5  *United States*, 390 U.S. 377, 389–90 (1968). Because the Court does not find that Mr. Cardiel's
6  Fourth Amendment rights were violated, the motion to suppress the evidence seized is **DENIED**.

**III.    MOTION TO DISMISS**

Mr. Cardiel filed his motion to dismiss, in part, based upon *United States v. Duarte*, 101 F.4th 657 (9th Cir. 2024). After the Court ruled in *United States v. Rahimi*, 144 S. Ct. 1889 (2024), the Ninth Circuit granted a rehearing en banc in *Duarte. Duarte*, 101 F.4th 657, reh'g en banc granted, opinion vacated, 2024 WL 3443151 (9th Cir. July 17, 2024). The Ninth Circuit vacated the three-judge panel decision and, as of now, it is not binding. *See* Advisory Committee Notes, Fed. R. App. P. 35-1 to 35-3. Consequently, *United States v. Vonxgay*, 594 F.3d 1111, 1118 (9th Cir. 2010) and *United States v. Phillips*, 827 F.3d 1171, 1175 (9th Cir. 2016) remain controlling.[3] Though neither employed the historical analysis outlined by *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 17 (2022), both relied upon the "longstanding prohibitions on possession of firearms by felons." *United States v. Guthery*, No. 2:22-CR-00173-KJM, 2023 WL 2696824, at *4 (E.D. Cal. Mar. 29, 2023). In keeping with the Court's obligation to construe Ninth Circuit opinions in a manner consistent with Supreme Court precedent (*See Federal Trade Commission v. Consumer Defense, LLC*, 926 F.3d 1208, 1213 (9th Cir. 2019)), the Court does not find that the Ninth Circuit precedents are "clearly irreconcilable" with *Heller*, *Bruen* or *Rahimi*. *Id.*; *United States v. Broadbent*, 2023 WL 6796468, at *3 (E.D. Cal. Oct. 13, 2023).

The Court finds further that § 922(g)(1) passes constitutional muster under *Bruen*, even without relying upon Ninth Circuit precedent. The Court agrees with and adopts the analysis set forth in *United States v. Alvarez-Mora*, 2024 WL 1638382, at *3–6 (D. Nev. Apr. 15, 2024) and *United States v. Brown,* 2023 WL 7017622, at *5 (D. Nev. Oct. 25, 2023) and notes the many

---

[3] *See also United States v. Whitney*, 2024 WL 1429461, at *2 (9th Cir. Apr. 3, 2024), ["The felon-in-possession statute, 18 U.S.C. § 922(g)(1), is facially constitutional."]

10

other courts that agree.[4] For example, in *United States v. Roberts*, ---F.Supp.3d---, 2024 WL 50889, at *16 (D. Alaska Jan. 4, 2024), the Court observed,

> While [the defendant] correctly notes that § 922(g)(1) and its immediate precursors only arose in the twentieth century, [fn.] the historical record indicates that representative analogues to § 922(g)(1)—such as those discussed by the Government—arose much earlier, including during the Founding Era. [fn.]  As illustrated by early debates and attitudes to firearm regulation during the drafting of the Second Amendment, as well as nascent state laws barring the use of firearms by criminals, there appears to be a strong tradition of such firearm regulation in the colonial and Founding Eras. [fn.]  Early regulations and binding Supreme Court and Ninth Circuit jurisprudence also reveal that the Second Amendment is intrinsically tied to the idea of a "virtuous" citizenry, whereby only "law-abiding" or "peaceable" citizens have the right to keep and bear arms. [fn.]
>
> [The defendant] further observes that certain laws placed temporal limits on criminal firearm bans, and contends that such limits indicate earlier generations addressed the problem of firearm misuse through "materially different means" rather than a "categorical, lifetime ban" on firearm possession. [fn.]  He points to two instances in which such bans were not enacted to suggest a general pattern of legislatures rejecting firearm regulation. [fn.]  While not every State enacted disarmament statutes, [the defendant's] arguments dismiss numerous nascent state firearm bans on criminals and other groups deemed a threat to public safety. As [the defendant] acknowledges, "at various times, the United States regulated ... firearm possession by those feared to be violent." [fn.]  [The defendant] also sidesteps *Bruen's* instruction to identify historical analogues to modern regulations based on "how and why the regulations burden a law-abiding citizen's right to armed self-defense," [fn.] and focuses instead on how early regulations are "dissimilar" from § 922(g)(1). [fn.] But the Government need only offer evidence of a "well-established and representative historical analogue, not a historical *twin*." [fn.]
>
> Moreover, early American disarmament laws barring certain groups, including felons and other classes of people deemed dangerous or untrustworthy, are not too attenuated to lend historical analogical support for § 922(g)(1). Rather, these laws are "distinctly similar" to § 922(g)(1) in "how and why" they burden an individual's right to armed self-defense; like § 922(g)(1), they sought to safeguard public safety by limiting access to firearms by persons perceived to be a threat to society. While both [the defendant] and the Government correctly observe that many pre-Revolutionary and early American disarmament laws were biased by racial animus and remain unquestionably problematic, [fn.]  these laws share a core legislative purpose with § 922(g)(1). And, as the Court has previously explained, governments "may restrict firearm possession to groups viewed as dangerous in modern times, not only to those viewed as dangerous in 1791." [fn.] Here, the colonial, pre-Revolutionary, and early American historical practice of felon disarmament demonstrates that people who committed crimes were viewed as dangerous in the late-eighteenth century. Thus, § 922(g)(1) is consistent with this Nation's well-established historical tradition of "banning dangerous people

---

[4] *See United States v. Moore*, 2023 WL 154588, at *2 (D. Or. Jan. 11, 2023) citing *United States v. Butts*, 2022 WL 16553037 (D. Mont. Oct. 31, 2022) (collecting cases); *United States v. Carleson*, 2022 WL 17490753 (D. Alaska Oct. 28, 2022); *United States v. Siddoway*, 2022 WL 4482739 (D. Idaho Sept. 27, 2022); *United States v. Hill*, 2022 WL 4361917 (S.D. Cal. Sept. 20, 2022).

from possessing guns." [fn.]  In so holding, the Court follows every other district court in the Ninth Circuit, including the District of Alaska, in finding § 922(g)(1) constitutional under *Bruen's* historical framework.

*United States v. Roberts*, 2024 WL 50889, at *15-16.

*Rahimi* does not change this legal landscape. *Rahimi* rebuffed a Second Amendment challenge to § 922(g)(8), which prohibits the possession of firearms by those subject restraining orders arising within the domestic violence context and had no occasion to consider whether convictions for non-violent felonies were more akin to a domestic violence "restrainee" than a felon. 144 S. Ct. at 1895-1896, 1898. Even though *Rahimi* concerned a prohibited person who had perpetrated domestic violence, the Court took the opportunity to reaffirm the presumptive prohibition of possessing firearms by felons: ". . . nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 1902.

Because the prohibition against felons possessing firearms found in § 922(g)(1) is consistent with the Nation's regulatory tradition of firearm regulation, Defendant's Motion to Dismiss, (Doc. 28), is **DENIED** without prejudice to refiling if it becomes appropriate after the en banc decision in *Duarte*.

**ORDER**

For the reasons set forth above, the Court **ORDERS**:

1. The motion to dismiss the indictment (Doc. 28) is **DENIED**.

2. The motion to suppress the defendant's statements (Doc. 29) is **DENIED**.

3. The motion to suppress the physical evidence (Doc. 31) is **DENIED**.

IT IS SO ORDERED.

Dated:   **August 29, 2024**

UNITED STATES DISTRICT JUDGE

12